IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

BRIAN G. NASWORTHY,
    Petitioner,

vs.                                     Case No.:  3:11cv388/RV/EMT

KENNETH S. TUCKER,
    Respondent.
_____/

## REPORT AND RECOMMENDATION

    This cause is before the court on Petitioner's petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 (doc. 1).  Respondent filed an answer and relevant portions of the state court record (doc. 17).  Petitioner filed a reply (doc. 24).

    The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters.  *See* N.D. Fla. Loc. R. 72.2; *see also* 28 U.S.C. § 636(b) and Fed. R. Civ. P. 72(b).  After careful consideration of all issues raised by Petitioner, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a).  It is further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

I.     BACKGROUND AND PROCEDURAL HISTORY

    The relevant aspects of the procedural background of this case are established by the state court record (*see* doc. 17).[1]  Petitioner was charged in the Circuit Court in and for Escambia County, Florida, Case No. 2008-CF-4811, with one count of attempted robbery armed with a firearm (Count

---

[1] Hereinafter all citations to the state court record refer to the exhibits submitted with Respondent's answer (doc. 17).  If a cited page has more than one page number, the court cites to the "Bates stamp" page number.

1), one count of aggravated battery with a deadly weapon (Count 2), and one count of armed kidnapping with a weapon and with intent to commit a felony (Count 3) (Ex. A at 1). At trial, the court granted defense counsel's motion for judgment of acquittal on the aggravated battery count (Count 2) (Ex. B at 126, *see also* Ex. A at 52). The jury found Petitioner guilty of attempted robbery armed with a firearm and attempted kidnapping with a firearm (Ex. A at 40–43, Ex. B). On April 30, 2009, Petitioner was sentenced to concurrent terms of ten (10) years of imprisonment with a ten-year mandatory minimum on each count, with pre-sentence jail credit of 225 days (Ex. A at 46–52).

Petitioner, through counsel, appealed the judgment to the Florida First District Court of Appeal ("First DCA"), Case No. 1D09-2987 (Ex. A at 62). Prior to the filing of briefs, Petitioner filed a motion to correct illegal sentence, pursuant to Rule 3.800(b)(2) of the Florida Rules of Criminal Procedure, in the state circuit court (Ex. C at 72–79). The court granted the motion to the extent that the judgment was corrected to reflect that his conviction of attempted robbery armed with a firearm was a second degree felony, not a first degree felony, and otherwise denied the motion (*id.* at 80–83). The parties then filed briefs in the direct appeal (Exs. D, E). The First DCA affirmed the judgment per curiam without written opinion on February 5, 2010, with the mandate issuing March 29, 2010 (Exs. F, I). Nasworthy v. State, 29 So. 3d 1122 (Fla. 1st DCA 2010) (Table). Petitioner did not seek further review.

On March 31, 2010, Petitioner filed a motion to mitigate sentence, pursuant to Rule 3.800(c) of the Florida Rules of Criminal Procedure (Ex. J). The state circuit court summarily denied the motion on April 8, 2010 (Ex. K).

On September 28, 2010, Petitioner filed a motion for postconviction relief, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. L at 1–8). In an order rendered February 8, 2011, the state circuit court summarily denied the motion (*id.* at 10–14). Petitioner appealed the decision to the First DCA, Case No. 1D11-1649 (*id.* at 73). The First DCA affirmed the decision per curiam without written opinion on June 2, 2011, with the mandate issuing August 3, 2011 (Exs. M, P). Nasworthy v. State, 65 So. 3d 518 (Fla. 1st DCA 2011) (Table).

Petitioner filed the instant federal habeas action on August 18, 2011 (doc. 1). Respondent does not dispute the timeliness of the petition (doc. 17 at 2).

II.     STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States. As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA). Pub.L. 104-132, § 104, 110 Stat. 1214, 1218–19. In relevant part, section 2254(d) now provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review in Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[2] The appropriate test was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case

---

[2] Unless otherwise noted, references to Williams are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13). The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

> differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring); Ramdass v. Angelone, 530 U.S. 156, 120 S. Ct. 2113, 2119–20, 147 L. Ed. 2d 125 (2000). In employing this test, the Supreme Court has instructed that on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." Lockyer v. Andrade, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003). The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case." Neelley v. Nagle, 138 F.3d 917, 923 (11th Cir. 1998), *overruled on other grounds by* Parker v. Head, 244 F.3d 813, 835 (11th Cir. 2001).

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'" Lockyer, 538 U.S. at 73 (quoting Williams, 529 U.S. at 405–06). The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2002) (quoting Williams, 529 U.S. at 405–06). If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim.

If on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases. The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively

unreasonable." Williams, 529 U.S. at 409. Whether a State court's decision was an unreasonable application of a legal principle must be assessed in light of the record the court had before it. Holland v. Jackson, 542 U.S. 649, 652, 124 S. Ct. 2736, 2737–38, 159 L. Ed. 2d 683 (2004) (per curiam); *cf.* Bell v. Cone, 535 U.S. 685, 697 n.4, 122 S. Ct. 1843, 1851 n.4, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law). An objectively unreasonable application of federal law occurs when the State court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001). "In determining whether a state court's decision represents an unreasonable application of clearly established federal law, a federal court conducting habeas review 'may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.'" Gill v. Mecusker, 633 F.3d 1272, 1287 (11th Cir. 2011) (quoting Williams, 529 U.S. at 411) (citing Harrington v. Richter, — U.S. —, 131 S. Ct. 770, 786–87 (Jan. 19, 2011)). The AEDPA's "unreasonable application" standard focuses on the state court's ultimate conclusion, not the reasoning that led to it. *See* Gill, *supra* at 1291 (citing Harrington, 131 S. Ct. at 786). Under § 2254(d), a habeas court must determine what arguments or theories supported or could have supported the state court's decision, and then ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court. *See* Harrington, 131 S. Ct. at 786; *see also* Gill, *supra,* at 1292 (the federal district court may rely on grounds other than those articulated by the state court in determining that habeas relief was not warranted, so long as the district court did not err in concluding that the state court's rejection of the petitioner's claims was neither an unreasonable application of a Supreme Court holding nor an unreasonable determination of the facts).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The Supreme Court has clarified that: "a decision adjudicated on the merits in a state

court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see e.g.* Miller-El, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"); Jones v. Walker, 469 F.3d 1216, 1226–27 (11th Cir. 2007) (holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by clear and convincing evidence," and concluding that that standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact."). The "unreasonable determination of the facts" standard is only implicated to the extent that the validity of the state court's ultimate conclusion is premised on unreasonable fact finding. *See* Gill, 633 F.3d at 1292. A petitioner is not entitled to relief unless he demonstrates by clear and convincing evidence that the record reflects an insufficient factual basis for affirming the state court's decision. *Id.*

Only if the federal habeas court finds that the petitioner satisfied AEDPA, and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims. *See* Panetti v. Quarterman, 531 U.S. 930, 953, 127 S. Ct. 2842, 2858, 168 L. Ed. 2d 662 (2007); Jones, 469 F.3d 1216 (same). The writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a).

Within this framework, the court will review Petitioner's claim.

III. PETITIONER'S CLAIM

> Ground One: "Petitioner was denied the Sixth Amendment right to testify on his own behalf when counsel failed to advise Defendant of his right to testify and failed to consult with Defendant on the strategic implications on [sic] the Defendant testifying, and absent counsel's deficiency, the Defendant would have testified that he knew the alleged victim, Joshua Kirby, from the pain clinic that both patronized, contradicting Kirby's trial testimony, and where

<u>Kirby's testimony and that of clinic owner, Mark Antigues, was the sole evidence against Defendant, there is a reasonable probability that Defendant would have been acquitted."</u>

Petitioner asserts the only incriminating evidence in his case was the testimony of the victim, Joshua Kirby, and the owner of a "pill mill" (pain clinic), Mark Antigues (doc. 1 at 3–5).[3] Petitioner states Investigator Lawson with the Florida Department of Law Enforcement, testified that Artigues was under investigation for trafficking in prescription drugs, and Petitioner and Kirby were patients of Mr. Artigues's clinic (*id.* at 3). Petitioner states Joshua Kirby testified he was a drug addict and a patient at the clinic (*id.*). Petitioner states Kirby additionally testified he had never met Petitioner prior to January 31, 2006, the date Petitioner grabbed him by the shirt, pulled him out of the doorway of his residence, brandished a gun, struck him several times, demanded money and drugs from him, and attempted to force him into a vehicle with him (Petitioner) and Artigues (*id.* at 3–4).

Petitioner states Mr. Artigues testified he entered a plea to federal charges related to his operation of the pain clinic (doc. 1 at 4). Petitioner states Artigues testified that Petitioner and Kirby were patients at the clinic, and he "extended credit" for clinic visits (that is, deferred payment for visits) to both of them (*id.*). Petitioner states Artigues testified he had heard that Kirby was taking advantage of him, so he took Petitioner with him to collect money from Kirby on January 31, 2006 (*id.*). Petitioner states Artigues testified that he brought his father's gun and gave it to Petitioner to approach Kirby's front door (*id.*). Petitioner further states Artigues testified that Petitioner pushed Kirby out to the car and struck him with the gun, and then Kirby ran to a mechanic's body shop next door (*id.*). Petitioner states Artigues testified Mr. Kirby returned to the clinic a month later looking for drugs (*id.*).

Petitioner states Kenneth Anderson testified he observed the incident from his body shop, approximately forty (40) feet away (*id.*). He states Anderson testified he observed two white men and a black man arguing over money (Petitioner states he, Artigues, and Kirby are Caucasian) (*id.*). Petitioner states Anderson testified the black man was the "muscle," while the white man "did most of the talking" to the other white man, and the black man "took a swipe" at the victim, who then ran

---

[3] The trial transcript demonstrates the correct spelling of this individual's surname is Artigues (*see* Ex. B at 53).

Case No. 3:11cv388/RV/EMT

away (*id.*).  Petitioner states Anderson testified he called 911, and the victim came into the body shop while Anderson was still on the phone, but the victim refused to talk to the 911 operator (*id.*).

Petitioner states he did not testify in his own defense (doc. 1 at 4).  He states his consultation with defense counsel concerning whether he should testify consisted of counsel's advising him that his testimony was not necessary and would only harm his case because of his gold teeth and imposing physical appearance (*id.*).  Petitioner states he mentioned to counsel, during one of their meetings, that he had met the victim at the pain clinic and spoken to him a few times (*id.* at 5).  Petitioner alleges defense counsel never informed him of his right to testify, never consulted with him about the strategic implications of his decision, and never advised him that the decision whether to testify was ultimately his (*id.*).  Petitioner alleges that had he been informed of his rights, he would have testified that he knew Joshua Kirby from the clinic, and they had discussed obtaining credit from Mr. Artigues (*id.*).  He asserts his testimony would have impeached Kirby's testimony that he never saw Petitioner prior to the date of the crimes, and it would have cast doubt on Kirby's pre-trial identification from a photographic lineup, because it would have suggested Kirby recognized Petitioner from the clinic (*id.*; *see also* doc. 24 at 4).  Petitioner states he also would have testified he was not involved in the incident on January 31, 2006, but he admits he told Artigues that Kirby had bragged about "'getting over' on Antigues [sic] about money Kirby owed" (doc. 1 at 5).  He states this testimony would have been supported by Mr. Anderson's testimony that the "muscle" man was a black man (*id.*).

Respondent appears to concede Petitioner exhausted this claim in the state courts (doc. 17 at 2–6).  Respondent contends the state court's adjudication of the claim was not contrary to or an unreasonable application of clearly established federal law (*id.*).

       1.       Clearly Established Federal Law

The standard for evaluating claims of ineffective assistance of counsel is set forth in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).  To obtain relief under <u>Strickland</u>, Petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different.  *Id.* at 687–88.  If Petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief.  *Id.* at 697.

"The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one."  <u>Jones v. Campbell</u>, 436 F.3d 1285, 1293 (11th Cir.

2006) (citing Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)). The focus of inquiry under the performance prong is "reasonableness under prevailing professional norms." Strickland, 466 U.S. at 688–89. "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. at 689. If the record is not complete regarding counsel's actions, "then the courts should presume 'that what the particular defense lawyer did at trial—for example, what witnesses he presented or did not present—were acts that some lawyer might do." Jones, 436 F.3d at 1293 (citing Chandler, 218 F.3d at 1314–15 n.15). Furthermore, "[e]ven if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." Rogers v. Zant, 13 F.3d 384, 386 (11th Cir. 1994). Counsel's performance is deficient only if it is "outside the wide range of professional competence." Jones, 436 F.3d at 1293 (citing Strickland, 466 U.S. at 690); Lancaster v. Newsome, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing that petitioner was "not entitled to error-free representation"). "[T]here are no 'absolute rules' dictating what reasonable performance is . . . ." Michael v. Crosby, 430 F.3d 1310, 1320 (11th Cir. 2005) (quoting Chandler, 218 F.3d at 1317). Indeed, "'[a]bsolute rules would interfere with counsel's independence—which is also constitutionally protected—and would restrict the wide latitude counsel have in making tactical decisions.'" Id. (quoting Putman v. Head, 268 F.3d 1223, 1244 (11th Cir. 2001)).

As to the prejudice prong of the Strickland standard, Petitioner's burden of demonstrating prejudice is high. See Wellington v. Moore, 314 F.3d 1256, 1260 (11th Cir. 2002). The Supreme Court has cautioned that "'[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'" Id. (quoting Strickland, 466 U.S. at 693). However, the Court has also clarified that a petitioner need not demonstrate it "more likely than not, or prove by a preponderance of evidence," that counsel's errors affected the outcome. Strickland, 466 U.S. at 693–94. Instead,

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A

>reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Id.* at 694. Indeed, it would be "contrary to" the law clearly established in <u>Strickland</u> for a state court to reject an ineffectiveness claim for failing to prove prejudice by a preponderance of the evidence. <u>Williams v. Taylor</u>, 529 U.S. at 405–06. Further, the prejudice assessment does "not depend on the idiosyncracies of the particular decisionmaker," as the court should presume that the judge or jury acted according to law. <u>Strickland</u>, 466 U.S. at 694–95. "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.

A criminal defendant has "a fundamental constitutional" right to testify in his behalf at trial. *See* <u>Rock v. Arkansas</u>, 483 U.S. 44, 107 S. Ct. 2704, 97 L. Ed. 2d 37 (1987). This right is personal to the defendant and cannot be waived either by the trial court or by defense counsel. *See* <u>Gallego v. United States</u>, 174 F.3d 1196, (11th Cir. 1999). Competent legal representation requires that counsel advise the criminal defendant of his right to testify and that the final decision of whether to testify is the defendant's alone; additionally, counsel must honor his client's decision. *Id.*

A claim of ineffective assistance of counsel is the proper framework to analyze a petitioner's allegation that his attorney violated his right to testify. *See* <u>U. S. v. Teague</u>, 953 F.2d 1525, 1534 (11th Cir. 1992) (en banc). Although it is the defendant's right ultimately to decide whether to testify, counsel has the duty to advise the defendant "in the strongest possible terms" not to testify if counsel believes that is the wiser course. *See* <u>Teague</u>, 953 F.3d at 1533. Although an attorney may be ineffective for preventing the accused from testifying, Petitioner must also show that he was prejudiced as a result. *See* <u>Nichols v. Butler</u>, 953 F.2d 1550, 1553 (11th Cir. 1992) (en banc). As in all claims of ineffective assistance of counsel, Petitioner maintains the burden of establishing his contentions; thus, he must produce something more than a bare, unsubstantiated, self-serving allegation that his counsel prevented him from taking the stand. <u>Underwood v. Clark</u>, 939 F.2d 473, 476 (7th Cir. 1991). Indeed, a conclusory assertion that counsel did not allow a defendant to testify, without particular factual allegations as to both attorney error and prejudice to the outcome, is insufficient to warrant an evidentiary hearing. *See id.*; <u>Siciliano v. Rose</u>, 834 F.2d 29, 30–31 (1st Cir. 1987).

    2.  Federal Review of State Court Decision

Petitioner raised this claim as Ground One in his Rule 3.850 motion (Ex. L at 3–7). In the state circuit court's written decision denying the claim, the court correctly identified the Strickland standard as the applicable legal standard (*id.* at 12). The court adjudicated the claim as follows:

> In the instant case, Defendant was charged with attempted robbery armed with a firearm, aggravated battery with a deadly weapon, and armed kidnapping with a weapon. It was alleged that both Defendant and the victim of these crimes, Joshua Kirby, were clients of a "pill mill," run by Mark Artigues.[FN 1: Although Defendant refers to this individual as Mark Antigues, the transcript and record reveal that his name is Mark Artigues.] The State offered evidence to show that Artigues and Defendant, in an attempt to collect money owed to Artigues by Kirby, went to Kirby's home, where Defendant forcibly removed Kirby from his home and demanded drugs and money from Kirby. The defense presented an eyewitness who tentatively indicated that a black man was the physical aggressor in the incident.[FN 2: Defendant, Kirby, and Artigues are white.]
> . . . .
> Defendant has failed to demonstrate that he was prejudiced by any alleged deficiency of his counsel. In order to merit an evidentiary hearing on a claim that counsel deprived a defendant of the right to testify, "even where no waiver is shown to be of record, a defendant must show more than "that he would have declared his innocence" if he had testified. Jackson v. State, 711 So. 2d 1371, 1373 n.1 (Fla. 4th DCA 1998). Although the victim did testify that he did not know Defendant, Defendant fails to show how testimony that Defendant had actually met and spoken with the victim regarding getting credit from the clinic previously would bolster his defense, other than to provide impeachment on a minor point.[FN 4: See Attachment 2, trial transcript excerpts, pages 33–53. Defendant's position at trial was simply that he was not the perpetrator.] Furthermore, even had Defendant testified as to this point, it would do nothing to diminish the impact of the testimony of Artigues, who was a participant in the crime and also testified that Defendant committed the acts of which he was accused.[FN 5: See Attachment 2, trial transcript excerpts, pages 53–76.] With regard to Defendant's proposed testimony that he told Artigues that Kirby was boasting about taking advantage of him, Artigues himself testified that Kirby owed him money and that "a couple of people would tell me they didn't know where he was and they had seen him and he was talking that he got over on me, that he didn't intend on paying me what he owed me on (sic) I was a fool or whatever. So I got wind of what was going on just through other patients."[FN 6: See Attachment 2, trial transcript excerpts, page 58.] Defendant has failed to show any reason why his testimony as to this point would have aided in his defense in any way, as it was clear to the jury that Artigues had been told of Kirby's conduct and statements. Indeed, Artigues admitted that he had gone to Kirby's house in an attempt to collect the debt, and that he had taken Defendant with him because Defendant also owed him money. Because Defendant has failed to demonstrate that he was prejudiced by counsel's alleged

failure to advise him properly regarding his right to testify, he is not entitled to postconviction relief.

(Ex. L at 10–13).

Petitioner appealed the decision to the First DCA, and the appellate court affirmed the lower court's decision without written opinion (Ex. M).

Even if Petitioner's decision not to testify resulted from counsel's failure to advise him of the strategic implications of exercising his right to testify or not to testify, and counsel's failure to advise him that the decision whether to testify was ultimately his, Petitioner has not shown that the state court's application of Strickland's prejudice prong was objectively unreasonable. Mark Artigues was a very convincing witness for the State, even though he was wearing handcuffs and a jumpsuit when he testified (Ex. B at 53–68). He testified he entered a plea and was sentenced on federal charges of distribution of a controlled substance, money laundering, and possession of a firearm during a conspiracy, in relation to a pain clinic he owned (*id.*). Mr. Artigues testified he came to Pensacola from New Orleans in 2005 after Hurricane Katrina, and opened the clinic shortly thereafter (*id.*). He testified that Josh Kirby, the victim in this case, was one of the first patients of the clinic (*id.*). Artigues testified some of his business partners had a pain clinic in New Orleans, and many of their patients, like Petitioner, became patients of the Pensacola clinic after the hurricane (*id.*). Artigues testified the pain clinic was a "cash business," because many of the patients had limited incomes (*id.*). He testified he often extended credit to patients, because he did not want to deny them their medication simply because they could not afford it (*id.*). Mr. Artigues testified he not only extended credit to Petitioner, but he personally "gave him money out of my pocket," because he was a fellow hurricane victim whose family was displaced (*id.*). Artigues testified Petitioner offered to repay him:

> He just mentioned, he said, look, if I can ever help you in any way, let me know. I was like Brian [Petitioner], how can you help me? You're a patient here. I don't need your help. He said if you ever need anything done. I said, great. I'll keep it in mind. I didn't think anything of it. I'm not in that kind of business. There's no way I thought he could ever help me.

(*id.* at 57).

Mr. Artigues testified he also extended credit to Josh Kirby (Ex. B at 57). He testified that during one of Kirby's visits to the clinic, he had only $200.00, but his visit cost $400.00, so Artigues told him he would allow him to see the doctor, but Kirby was supposed to bring the rest of the money

a week or two later (*id.*).  Artigues testified Kirby did not honor his end of the deal (*id.*).  He testified that the people who went to pain clinics in Pensacola, "it's like a subculture with them.  Everybody knows everybody." (*id.*).  He testified he asked other patients how he could reach Kirby, and some patients told him Kirby was bragging that he did not intend to repay Artigues (*id.*).  Artigues testified he wanted to get his money, so he called Petitioner (*id.* at 59).  He testified, "in the back of my head I remembered what he said, hey, if you ever need anything.  So just for protection, I called him." (*id.* at 59).  Artigues testified he and Petitioner met at a convenience store, and Petitioner got into the car with him to find Kirby (*id.*).  Artigues testified he had his father's gun with him and gave it to Petitioner to scare Kirby to get him outside his residence (*id.* at 59–60).  He testified he found Kirby's residence, unloaded the gun, and gave it to Petitioner with instructions to "go get him out here" (*id.* at 60–62).  Artigues testified Petitioner knocked on the door, and Kirby opened it (*id.* at 62–63).  He testified Petitioner "started muscling him down the stairs" (*id.* at 63).  He testified Petitioner had the gun and was "kind of leaning on him to get him to come my way" (*id.*).  He testified Petitioner attempted to force Kirby into the car (*id.* at 72).  Artigues testified he demanded his money from Kirby, and Kirby said he did not have it (*id.* at 63–65).  He testified that during their conversation, Petitioner "push[ed] him around and he smacked him in the head with the gun," at which point Kirby ran to a nearby mechanic's shop (*id.* at 64–65).  Artigues testified he asked Petitioner, "What are you doing? . . . Why did you do that?," and told him, "Let's get out of here" (*id.* at 65).  He testified they got back in the car and left (*id.*).  Artigues testified Josh Kirby eventually came back to the pain clinic (*id.* at 65–66).  He testified Petitioner also continued to come to the clinic (*id.* at 66).  Artigues identified Petitioner in court as the person he took with him to Kirby's residence (*id.* at 67).

On cross-examination, Mr. Artigues readily admitted he involved Petitioner in the situation, and that he gave Petitioner the gun and instructed him to bring Kirby to him (Ex. B at 70–76).  He also admitted that although he was prosecuted on the federal charges, he was not prosecuted for the incident involving Petitioner and Kirby (*id.*).  Defense counsel attempted to impeach Mr. Artigues's motive for testifying, "You freely admitted to all of these events, admitting to several felonies, without the hope of favorable treatment; is that correct?"  (*id.* at 74).  Artigues responded, "Nobody ever mentioned anything to me.  I was asked to tell the truth." (*id.*).  On re-direct Artigues testified he was

not offered any kind of deal from federal or state officials involving his testimony in Petitioner's case (*id.* at 75–76).

Josh Kirby testified he had never seen Petitioner before he appeared at his door on January 31, 2006 (Ex. B at 33–52). He testified to essentially the same facts as Mark Artigues in describing the incident that occurred that day (*id.*). Kirby testified Petitioner snatched him out of the door of his trailer and pushed him down the steps and to the road, where Mark Artigues was leaning against a car (*id.*). Kirby testified Artigues hit him, then Petitioner hit him, then Artigues "kneed" him (*id.*). He testified after the two hit him a few times, Petitioner pulled out a gun, and they attempted to force him into the backseat of the car (*id.*). He testified he refused to get in the car, and the two men punched him again (*id.*). Kirby testified he was then hit in the head with the gun, and he "hit" Petitioner out of the way and ran to a mechanic's shop (*id.*). He admitted he went back to the clinic after the incident, and Mr. Artigues took his money but did not allow him to see a doctor (*id.*). Kirby testified he was shown two different photographic lineups, State's Exhibits 2 and 4 (*id.*; *see also* Ex. A at 45, 45A, 45B, 45C). He testified he identified the photograph of the person who was with Artigues that day and had the gun, and he placed his initials near that person's photograph on State's Exhibit 2 (*id.* at 45).[4] He also identified Petitioner in court as the person who had the gun and hit him with it (*id.* at 45–46). Kirby testified he eventually told law enforcement about the incident and cooperated with them during the criminal investigation of the pain clinic (*id.* at 44). On cross-examination, defense counsel asked Mr. Kirby, "And to your knowledge, Mr. Nasworthy was a patient there [at the pain clinic] as well during that time, right?" (*id.* at 47). Kirby responded, "I don't know" (*id.*).

Eli Lawson, a special agent with the Florida Department of Law Enforcement ("FDLE") testified he was involved in the criminal investigation of the pain clinic and became aware of the incident involving Mr. Kirby, Mr. Artigues, and Petitioner (Ex. B at 19–20). He testified during the investigation, he spoke with Mr. Ken Anderson two years after the incident (*id.* at 25–26). He testified he showed Mr. Anderson State's Exhibit 2, the photographic lineup which included Petitioner's photograph, but Anderson was unable to pick anyone out as being involved in the incident

---

[4] Kirby testified he did not identify anyone in the lineup marked State's Exhibit 4, because Petitioner's photograph "wasn't on there" (Ex. A at 45; *see also* Ex. A at 81–85 (testimony of State's witness, explaining why the two lineups contained different photographs)).

(*id.* at 26). Agent Lawson testified that Mr. Anderson told him he did not recall a lot of detail about the incident, but he "guessed" that a white male and a black male were involved (*id.* at 27). Lawson also testified that Mr. Artigues and Mr. Kirby positively identified the person that was with them that day as Petitioner (*id.* at 28).

On cross-examination by defense counsel, Lawson testified he interviewed Petitioner regarding the case, and Petitioner denied any involvement in or knowledge of the incident (Ex. B at 31). Lawson testified Petitioner also denied ever seeing or using the gun that was used (*id.*). Lawson reiterated that Petitioner's photograph was included in one of the lineups shown to Mr. Anderson, and Anderson could not identify Petitioner as one of the men involved in the crimes (*id.*).

Defense counsel called Kenneth Anderson as a defense witness (Ex. B at 105–16). He testified he owned a body shop near the trailer where the incident occured on January 31, 2006 (*id.*). He testified the incident occurred in "bright daylight," and he observed it "very clearly" (*id.*). Anderson testified he observed a white man and a black man demanding money from the victim outside the door of the neighboring trailer (*id.*). He testified the white man was "doing most of the talking," and the black man "took a swipe" at the victim (*id.*). Anderson testified that the victim took off running and said, "He's got a gun. He hit me. Call 911." (*id.*). Anderson testified he called 911, and the other two men—the black man and the white man—got in the car and left (*id.*). He testified the victim refused to talk to the 911 operator, but he used Anderson's phone to call someone else (*id.*). Anderson testified he heard the victim say he did not know who the black man was, but he mentioned the name of the white man (*id.*). Mr. Anderson testified he was shown a photographic lineup, but could not identify any of the men in the photographs as involved in the incident (*id.*). Defense counsel asked Anderson, "You see the Defendant? . . . Do you remember him being there—do you recognize him?" (*id.* at 112). Anderson responded, "No, I don't, sir." (*id.*).

Defense counsel argued during closing arguments that even though Petitioner exercised his right not to testify, his position was clear—he did not commit the crimes (*id.* at 150–56). Counsel further argued that the victim probably recognized Petitioner from the clinic, either before or after the incident (*id.* at 152).

Initially, Petitioner's theory that Josh Kirby knew him from the pain clinic was made known to the jury through Mark Artigues's testimony that (1) Petitioner and Kirby were patients at the pain

clinic, (2) the patients were part of "a subculture" in which "everybody knows everybody," and (3) Petitioner and Kirby continued to go to the clinic after the incident. Additionally, Petitioner's claim that he was not present during the incident was made known to the jury through Eli Lawson's testimony that Petitioner denied any involvement in or knowledge of the incident, and Kenneth Anderson's testimony that the man who "took a swipe" at the victim before the victim ran was a black man. Further, although Petitioner's personal presentation of his story to the jury would have been "unique and inherently significant," *see* Nichols, 953 F.2d at 1553, it would also have opened the door for the jury to hear that he had a prior felony conviction (*see* Ex. A at 14, Ex. B at 203).

   The undersigned notes that this case is not as close as Nichols, 953 F.2d at 1554, where the Eleventh Circuit held that a petitioner—who had been coerced by trial counsel into remaining silent and not testifying at trial—had been prejudiced under Strickland. There, the only evidence that the petitioner was the person involved in the crime for which he was convicted was an eyewitness identification of him by one store employee who had glimpsed him only briefly. *Id.* In the circumstances of that "very close case," where only the store employee's perception supported the petitioner's conviction, the court thus concluded that the petitioner should have been allowed to testify to his version of events. *Id.* Here, by contrast, the State presented definitive, unwavering testimony from Mark Artigues, who personally knew Petitioner and readily admitted his own participation in the instant crime as well as other federal crimes related to his operation of the pain clinic. Even upon rigorous cross-examination by defense counsel, the jury heard no evidence suggesting a motive for Mr. Artigues to falsely implicate Petitioner in the crimes. Based on the foregoing, the undersigned cannot say that the state court unreasonably concluded there was no reasonable probability the verdict would have been different had Petitioner testified. *See* United States v. Willis, 273 F.3d 592, 598 (5th Cir. 2001) (defendant failed to demonstrate he received ineffective assistance of counsel for counsel's failure to call him to testify where defendant did not convincingly argue that his testimony would have assisted him at trial; defendant essentially would have engaged in a swearing contest with the investigating officers about what occurred at his post-arrest interview; and defendant did not even address the viability of the countervailing tactical reasons that his counsel might have had for declining to call him to the stand, that is, the government could have easily attacked his credibility by using his prior convictions); *see also, e.g.*, Lee v. Culliver, 300 F. App'x 689, 691 (11th Cir. 2008)

(unpublished) (distinguishing case from Nichols and concluding there was no reasonable probability the result of trial would have been different had defendant testified in his own defense where there was unwavering eyewitness testimony from the victim, who knew and recognized the defendant as the shooter, and two different witnesses testified they independently heard the defendant threaten the victim's girlfriend that he would "get" her "too," plainly suggesting that the defendant had admitted to the victim's shooting); Evans v. McNeil, No. 3:07cv98/LAC/EMT, 2009 WL 3163214, at *14 (N.D. Fla. Sept. 30, 2009) (unpublished) (petitioner failed to demonstrate reasonable probability he would have been acquitted if jury had heard his testimony where decisive issue was whether the jury found eyewitness's identification of petitioner credible and reliable; petitioner's proposed testimony would have had no impact on the jury's perception of eyewitness's credibility or reliability, and would not likely have cast doubt on eyewitness's testimony that he was "positive" that petitioner was the person who committed the crime, especially in light of eyewitness's testimony that he was familiar with petitioner by virtue of the fact that he had been a customer of his store for ten years; and petitioner's allegations ignored the impeaching impact of his prior felony convictions), *Report and Recommendation Adopted by* 2009 WL 3710725 (N.D. Fla. Nov. 3, 2009); Robinson v. McDonough, No. 4:05cv156/RH/WCS, 2006 WL 2729485, at *11 (N.D. Fla. Sept. 25, 2006) (unpublished) (petitioner failed to demonstrate prejudice resulting from counsel's insisting that he not testify and misadvising him as to consequences of testifying where petitioner failed to explain in detail what his testimony would have been and instead simply stated he would have demonstrated his innocence); Soto–Alvarez v. United States, No. 94–2230, 1995 WL 434799, at *1–2 (1st Cir. July 20, 1995) (unpublished) (no prejudice since defendant's testimony would not have brought any new information to the jury's attention); Nilsen v. Borg, No. 94–15145, 1994 WL 651941, at *1–2 (9th Cir. Nov. 18, 1994) (unpublished) (no prejudice since jury would likely have found defendant's testimony implausible); Ross v. Johnson, No. 95–0745–BH–S, 2000 WL 284204 (S.D. Ala. Feb. 7, 2000) (unpublished) (petitioner cannot establish prejudice under Strickland since he failed to demonstrate that he would have testified to an exculpatory set of facts that a reasonable jury could have accepted, or that under these circumstances his taking the stand would have affected the outcome of trial).

      It is possible that fairminded jurists could disagree that the state court's adjudication of Petitioner's claim is inconsistent with Strickland; however, that possibility only demonstrates that

(unpublished) (distinguishing case from Nichols and concluding there was no reasonable probability the result of trial would have been different had defendant testified in his own defense where there was unwavering eyewitness testimony from the victim, who knew and recognized the defendant as the shooter, and two different witnesses testified they independently heard the defendant threaten the victim's girlfriend that he would "get" her "too," plainly suggesting that the defendant had admitted to the victim's shooting); Evans v. McNeil, No. 3:07cv98/LAC/EMT, 2009 WL 3163214, at *14 (N.D. Fla. Sept. 30, 2009) (unpublished) (petitioner failed to demonstrate reasonable probability he would have been acquitted if jury had heard his testimony where decisive issue was whether the jury found eyewitness's identification of petitioner credible and reliable; petitioner's proposed testimony would have had no impact on the jury's perception of eyewitness's credibility or reliability, and would not likely have cast doubt on eyewitness's testimony that he was "positive" that petitioner was the person who committed the crime, especially in light of eyewitness's testimony that he was familiar with petitioner by virtue of the fact that he had been a customer of his store for ten years; and petitioner's allegations ignored the impeaching impact of his prior felony convictions), *Report and Recommendation Adopted by* 2009 WL 3710725 (N.D. Fla. Nov. 3, 2009); Robinson v. McDonough, No. 4:05cv156/RH/WCS, 2006 WL 2729485, at *11 (N.D. Fla. Sept. 25, 2006) (unpublished) (petitioner failed to demonstrate prejudice resulting from counsel's insisting that he not testify and misadvising him as to consequences of testifying where petitioner failed to explain in detail what his testimony would have been and instead simply stated he would have demonstrated his innocence); Soto–Alvarez v. United States, No. 94–2230, 1995 WL 434799, at *1–2 (1st Cir. July 20, 1995) (unpublished) (no prejudice since defendant's testimony would not have brought any new information to the jury's attention); Nilsen v. Borg, No. 94–15145, 1994 WL 651941, at *1–2 (9th Cir. Nov. 18, 1994) (unpublished) (no prejudice since jury would likely have found defendant's testimony implausible); Ross v. Johnson, No. 95–0745–BH–S, 2000 WL 284204 (S.D. Ala. Feb. 7, 2000) (unpublished) (petitioner cannot establish prejudice under Strickland since he failed to demonstrate that he would have testified to an exculpatory set of facts that a reasonable jury could have accepted, or that under these circumstances his taking the stand would have affected the outcome of trial).

    It is possible that fairminded jurists could disagree that the state court's adjudication of Petitioner's claim is inconsistent with Strickland; however, that possibility only demonstrates that

Petitioner is not entitled to federal habeas relief. *See* Morton v. Sec'y, Dep't of Corr., 2012 WL 2332758, at *6 (11th Cir. June 20, 2012) ("[W]e may issue a writ of habeas corpus only 'where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents.'" (quoting Harrington, 131 S.Ct. at 786)). Accordingly, the instant petition should be denied.

IV.   CERTIFICATE OF APPEALABILITY

As amended effective December 1, 2009, § 2254 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. Rule 11(b), Rules Governing Section 2254 Cases.

The undersigned finds no substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 483–84, 120 S. Ct. 1595, 1603–04, 146 L. Ed. 2d 542 (2000) (explaining how to satisfy this showing) (citation omitted). Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of new Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.   That the petition for writ of habeas corpus (doc. 1) be **DENIED**.

2.   That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 1st day of August 2012.

/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations may be filed within fourteen (14) days after being served a copy thereof. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u> A copy of objections shall be served upon the magistrate judge and all other parties. Failure to object may limit the scope of appellate review of factual findings.** *See* **28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).**